# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
August 3, 2021 Session

## STATE OF TENNESSEE v. TORIUS SAVILLE RUSSELL

**Appeal from the Circuit Court for Dyer County**
**Nos. 17-CR-50, 17-CR-51  R. Lee Moore, Jr., Judge**

_____

### No. W2020-01323-CCA-R3-CD
_____

Defendant, Torius Saville Russell, was indicted for one count of first degree felony murder, one count of attempted first degree murder, eight counts of aggravated assault, and one count of reckless endangerment. After the State closed its proof in chief, the trial court dismissed the attempted first degree murder count and partially dismissed the first degree felony murder count, allowing the jury to consider the lesser included offense of second degree murder. Defendant was convicted of second degree murder as a lesser included offense of felony murder, eight counts of aggravated assault, and one count of reckless endangerment. Defendant received a total effective sentence of 50 years. Defendant argues on appeal that: (1) the evidence at trial was insufficient to establish Defendant's identity as the shooter; (2) the trial court erred in partially granting Defendant's motion for judgment of acquittal as to first degree felony murder and allowing the State to pursue a lesser included offense; (3) the trial court abused its discretion in denying Defendant's motion for mistrial after the State's witness made two hearsay statements; and (4) the trial court abused its discretion in imposing a sentence of 40 years for second degree murder and in ordering the second degree murder sentence to be served consecutively to his sentences for aggravated assault and reckless endangerment. After a thorough review of the record and applicable authorities, we affirm Defendant's convictions and sentences.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the court, in JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

Lewis Jenkins Jr., Dyersburg, Tennessee, for the appellant, Torius Saville Russell.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Danny H. Goodman Jr., District Attorney General; and Karen Burns Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural Background*

Defendant's convictions stem from a shooting at a birthday party on November 17, 2016. After several witnesses identified him as the shooter, the Dyersburg Police Department arrested Defendant. The Dyer County Grand Jury indicted Defendant for 11 counts: one count of first degree felony murder, one count of attempted first degree murder, eight counts of aggravated assault, and one count of reckless endangerment. Prior to trial, the court granted a motion in limine to exclude evidence related to Defendant's gang activity and a motion to exclude hearsay related to Defendant shooting at Jonathan Amerson.[1] Defendant's trial began on August 5, 2019, and lasted three days. The following facts were established at trial:

In the early afternoon of November 17, 2016, the family and friends of Shanice Amerson gathered at a home in Dyersburg, Tennessee, to celebrate her son's second birthday. At around 3:00 p.m., Justin Kincaid drove Defendant to the home. When Defendant and Mr. Kincaid arrived, several individuals were in the front yard.

Latonia Hunt was standing in the front yard and noticed the approaching vehicle. She alerted Jonathan Amerson, the cousin of Ms. Amerson, that Defendant was driving up to the house. Jonathan Amerson was sitting in a chair near the street but quickly went inside the house. Mazie Jacobs, the mother of Ms. Amerson, testified that Ms. Hunt notified Jonathan Amerson because "[Defendant] was the dude that shot at them, like [. . .] a couple weeks ago." Defendant and Mr. Kincaid exited their vehicle, stepped into the yard, and asked Ms. Jacobs if Jonathan Amerson was in the house. Ms. Jacobs noticed Defendant had a pistol tucked into his waistband.

Dilcy McVay was in the yard. She heard Defendant's question to Ms. Jacobs and told Defendant that Jonathan Amerson was inside. After waiting a short while for Jonathan Amerson to come outside, Defendant and Mr. Kincaid returned to their vehicle. They drove to the end of the street and turned around. When their vehicle passed by the house going the other direction, it was traveling at a high speed. Several of the individuals in the yard saw Defendant hanging outside the window of the vehicle with a pistol in his hand as the vehicle drove by the house a second time. Ms. Jacobs and the other individuals in the yard quickly went inside the house. Ms. Jacobs called 911.

---

[1] A copy of the trial court's order granting the motion in limine and motion to exclude Jonathan Amerson's hearsay statements is not included in the record. Because several witnesses have the same surname, we will refer to them by their full names throughout the opinion.

Multiple Dyersburg police officers responded to Ms. Jacobs' disturbance call and weapons complaint. When they arrived, Ms. Jacobs told them Defendant and Mr. Kincaid had been at the house. The officers left the home and began searching for Mr. Kincaid's vehicle. They eventually located the suspect vehicle at Mr. Kincaid's home address. Mr. Kincaid was at home with his girlfriend at the time. The officers continued to search for Defendant, but were unable to find him.

Meanwhile, Ms. Jacobs and others decorated the front porch for the birthday party. The party was scheduled to begin at 4:00 p.m., but did not start until around 6:00 p.m. Although it was nearly dark outside as the party began, there was a street light directly across from the house. It is unclear how many people attended the birthday party.

Shortly after the party began, a man wearing a black hoodie approached the home and began shooting into the crowd of people on and around the porch. The shooter stood somewhere between the driveway of the home and the mailbox of the next-door duplex. There was one small tree between the two homes, closer to the road. Several adults at the party hurriedly ushered the children into the home.

Two children and seven adults were shot. Ms. Amerson was shot twice and did not survive her injuries. It is not clear how the shooter left the scene. Multiple officers arrived at the "very chaotic" scene around 6:20 p.m. and attempted to render aid to the victims. Jim Joyner, a lieutenant with the Dyersburg Police Department, Criminal Investigation Division, arrived on the scene shortly after the other officers. Lieutenant Joyner, along with Dyersburg Police Department detectives Jim Gray and Michael Leggett, helped process the crime scene.

Several of the victims were taken to the hospital to receive medical treatment for their injuries. Ms. Jacobs and her adult grandson, Charles Jackson, were among the injured. Detective Leggett was instructed to visit the hospital to take photographs and interview the victims. Detective Leggett interviewed Mr. Jackson, who initially could not identify the shooter. However, a few hours later, Ms. Jacobs and Mr. Jackson went to the Dyersburg Police Department and positively identified Defendant as the shooter in separate photographic lineups conducted by Detective Leggett. T.M.[2], who was 12 at the time of the shooting, was at the party. He identified Defendant as the shooter in a photographic lineup roughly 10 days after the shooting.

Ms. Jacobs testified she was standing on the front porch near the door to the house during the party. She saw Defendant standing behind a white, four-door vehicle parked in between her home's driveway and the next-door duplex's mailbox. He was wearing "a

---

[2] It is the policy of this court to protect the identity of minor victims.

black hoodie [with the hood up,] a white T-shirt up under it, [and] some dark blue jeans." When asked on cross-examination if she could see the shooter, she stated, "It was dark. But it was -- the street light." Ms. Jacobs testified the street light gave her enough light to see the shooter's face and that she saw the "gold in [Defendant's] mouth" and his neck and face tattoos. Ms. Jacobs admitted that the street light would have been somewhat behind the shooter and made it more difficult to see the shooter's face. However, the porch light of her house was on and provided sufficient lighting. Ms. Jacobs stated she did not know the exact distance between the front porch, her gravel driveway, and her next-door neighbor's mailbox, but that it was close enough for her to see the shooter's face. On redirect, Ms. Jacobs testified that even though the shooter was wearing a black hoodie, she could see his face "just as plain as it was daylight."

Mr. Jackson testified he was standing in the yard about five to 10 feet from the road. He testified, "I was watching as [Defendant and his companion] walked up. Before anything could happen -- I couldn't get nothing out because it happened so fast." Mr. Jackson testified that the shooter was wearing a black pullover hoodie and a white t-shirt that was visible beneath the hoodie. He stated there was adequate lighting to see the shooter's face and recognized the shooter as Defendant. He identified Defendant based on Defendant's face tattoos and the way he was smiling. Specifically, "[ ]He got white teeth. And when I seen [sic] that, I was, like, that's the same dude that was over here earlier."

T.M. testified he saw Defendant "standing beside the tree" located between the driveway and the mailbox next door. He could see Defendant because of the street light nearby.

Ms. Jacobs's husband, Jeffrey Dennis, was present during the shooting. He did not explain where he was standing when he saw Defendant start shooting, but testified that they "stood right there in the street. [Defendant] shook somebody's hand. I don't know whose hand he shook. [. . .] That's when all the gunfire started going off." Mr. Dennis further testified, "Is [sic] was that cat right there with the f***ing hoodie on[]" and pointed to Defendant. Mr. Dennis then stated, "The gold's in his mouth and everything."

Don Amerson, son of Ms. Jacobs and brother of Ms. Amerson, identified Defendant as the shooter for the first time during his testimony at trial. On cross-examination, Don Amerson admitted that he never told anyone other than his mother that he knew the shooter's identity. Detective Leggett testified that Don Amerson did not mention that he knew the identity of the shooter during an interview that took place as part of the police investigation.

- 4 -

Joseph Clark testified that he was incarcerated in the Dyer County Jail in the same prison pod as Defendant for roughly one year after the shooting. They talked about their respective cases several times. Mr. Clark testified Defendant told him he had been looking for Jonathan Amerson on the day of the shooting. According to Mr. Clark's recollection, Defendant did not see Jonathan Amerson on the first visit to the house. Mr. Clark recalled that regarding Defendant's second trip to the house, "[Defendant] just said that he walked up and started shooting and they started shooting back at him [. . . .] And he said he emptied the clip." Mr. Clark thought Defendant told him he was wearing shorts and a hoodie on the day of the incident. Mr. Clark recalled Defendant claimed, "[s]omebody said they could identify him by his tattoos. And he said he knows that wasn't true because he had a hoodie on, you couldn't see his tattoos." Mr. Clark testified that Defendant said he threw his weapon into "the deepest part of the Mississippi River."

During the State's examination of Jonathan Amerson, the State questioned him about a shooting that occurred in October of 2016. The State asked Jonathan Amerson if he knew who had shot at him during the shooting. He replied, "I didn't [know who it was] at the moment. But later on, they told me it was [Defendant]." Defense counsel objected. The trial court sustained the objection and offered a curative jury instruction. Later, the State asked Jonathan Amerson why he went into the house on November 17, 2016. Jonathan Amerson again stated it was because Defendant had shot at him back in October. Defense counsel objected and moved for a mistrial. During a bench conference, the court denied the motion. The trial court offered a second curative jury instruction.

After close of the State's proof, Defendant moved for a judgment of acquittal on all counts. The trial court granted the motion as to Count 2, the attempted first degree murder charge, and partially granted it as to Count 1, the first degree felony murder charge. The trial court stated that the partial dismissal "[did] not affect the possibility of second-degree [murder] on down."

Defendant called three witnesses: Rodney Lee, Ms. Hunt, and Lieutenant Joyner. Mr. Lee testified that he had known Defendant for roughly 25 years. He called Defendant his "stepson," despite not being married to Defendant's mother. Mr. Lee stated that Defendant did not live with him, but on November 17, 2016, was at home with him in Ripley, Tennessee, from 4:45 p.m. until 2:00 a.m. the next day when the police came to arrest Defendant. Mr. Lee recalled that he and Defendant had watched the "[f]ive o'clock news" and heard about the shooting in Dyersburg. Ms. Hunt testified as to her location on the front porch. She said that from where she was standing, she could not see the shooter. Defendant examined Lieutenant Joyner to establish the lighting conditions and the shooter's distance from the house. Lieutenant Joyner estimated the street light opposite the house was approximately 60 feet away and illuminated almost

the whole property. Lieutenant Joyner also stated the approximate distance between the street and the front porch was, "[t]hirty feet, thirty-five feet, something like that."

*Sentencing Hearing*

The trial court determined that Defendant was a Range II Offender for the Class A felony, second-degree murder, and ordered the maximum within-range sentence of 40 years. The trial court determined that Defendant was a Range III Offender for the Class C felonies and ordered Defendant to serve 10 years for each of the eight aggravated assault convictions and the single reckless endangerment conviction. The trial court ordered the 10-year sentences to be served concurrently with each other but consecutively to the 40-year sentence for second degree murder, for a total effective sentence of 50 years.

Defendant filed a timely motion for new trial and two amended motions for new trial. Following a delayed hearing due to the Covid-19 pandemic, the trial court denied Defendant's request for a new trial. This timely appeal follows.

*Analysis*

I.     *Sufficiency of the Evidence*

Defendant argues this Court must "undertake an overall assessment of rationality" and find the evidence to be insufficient to determine the shooter's identity. Specifically, Defendant claims that the lighting was inadequate for the witnesses to see the shooter's face, a tree obstructed the witnesses' view, and the witnesses presented wholly "preposterous and unbelievable" testimony. The State argues evidentiary credibility is a determination for the jury and that multiple eyewitnesses identified Defendant as the shooter. Moreover, Defendant confessed his involvement to an inmate. As a result, there was ample evidence to support the jury's determination. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Id.* (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.

1997)). Therefore, the prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

The State must prove that Defendant was the perpetrator beyond a reasonable doubt. *See State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (stating "identity of the perpetrator is an essential element of any crime"). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). In resolving questions of fact, such as the identity of the perpetrator, "the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

Here, Defendant is essentially challenging the credibility of the eyewitnesses. Questions concerning the credibility of witnesses and their testimonies are matters entrusted to the jury. *Wagner*, 382 S.W.3d at 297. It is not the role of this Court to reweigh such evidence. *Id.* In the light most favorable to the State, the evidence presented at trial established that Defendant visited the home to look for Jonathan Amerson earlier in the day on November 17, 2016. At around 6:00 p.m., a birthday party began. It was dusk outside, but the street light and porch light provided adequate lighting to illuminate almost the entirety of the home and yard. The shooting occurred sometime between 6:00 p.m. and 6:20 p.m. Ms. Jacobs, Mr. Jackson, and T.M. all confirmed that the shooter was standing between the gravel driveway and the neighbor's mailbox.

There were five eyewitnesses to the shooting who testified at trial: Ms. Jacobs, Mr. Jackson, T.M., Mr. Dennis, and Don Amerson. Three of the witnesses, Ms. Jacobs, Mr. Jackson, and Mr. Dennis, identified Defendant's smile and the gold inside of his mouth. Ms. Jacobs, Mr. Jackson, and T.M. all identified Defendant in photographic lineups. Don Amerson identified Defendant for the first time at trial. Mr. Clark testified that

Defendant admitted he committed the shooting and knew specific details about the night. Defendant presented one witness who testified that she was unable to identify Defendant based on the lighting conditions.

The jury weighed all of the proof and found the State's witnesses to be credible. We conclude that the proof was sufficient to establish Defendant's identity as the shooter. Defendant is not entitled to relief on this claim.

## II.        Constructive Amendment of the Indictment

Defendant argues that the trial court erred when it partially granted Defendant's motion for judgment of acquittal and effectively reduced Defendant's charge of first degree felony murder in Count 1 to second degree murder. Specifically, Defendant argues that the indictments for first degree felony murder and attempted first degree murder only informed Defendant about the specific intent crimes. Because second degree murder does not involve the specific intent element, Defendant argues it is a different crime for which he was unprepared to defend himself against. The State argues that Defendant waived this claim when he failed to raise the issue during the trial. Alternatively, the State insists that because second degree murder is a lesser included offense of first degree felony murder there was no amendment to the indictment.

At trial, Defendant sought a motion for judgment of acquittal at the conclusion of the State's proof. Essentially, counsel for Defendant argued that because there was no proof Defendant attempted to murder Jonathan Amerson, he could not be found guilty of Count 1 or Count 2. The trial court did not "recall hearing any definitive proof of the intent to kill Jonathan Amerson." As a result, the trial court granted the motion for judgment of acquittal on Count 2 and dismissed that charge. According to the trial court, that created "a problem" or a "flaw in one of the essential elements of first[]degree murder [in Count 1]" because there was no "intent to commit the attempted murder." The trial court went on to grant the motion in part on Count 1 "as to first[]degree murder" but explained that did "not affect the possibility of second[]degree on down."

Counsel for Defendant indicated that he understood the trial court's ruling. There was no objection made at trial and Defendant put on proof at that point. Defendant later raised the constructive amendment argument in his motion for new trial. In our view, the issue was preserved for appeal.

An accused has a constitutional right to be informed of the nature and cause of the accusation against him or her. U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9. An indictment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. T.C.A.

§ 40-13-202; *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). "Because an accused in a criminal prosecution has a right to fair and reasonable notice of the charges against which he must defend, [']the accused may be convicted only of a crime [that] is raised by the indictment or [that] is a lesser-included offense thereof.['] *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001) (citing *Hagner v. United States*, 285 U.S. 427, 431 (1932))[.]" *State v. Myers*, 581 S.W.3d 173, 180 (Tenn. 2019). Our supreme court has previously held that second degree murder is a lesser included offense of felony murder. *State v. Ely*, 48 S.W.3d 710, 721 (Tenn. 2001). The supreme court explained:

> After comparing the respective elements of felony murder, second degree murder, reckless homicide, and criminally negligent homicide, it appears that the elements of the lesser offenses are a subset of the elements of the greater and otherwise differ only in the mental state required. We hold that because the mental states required for the lesser offenses differ only in the level of culpability attached to each in terms of seriousness and punishment, the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder under part (b) of the [*State v. ]Burns*[, 6 S.W.3d 453 (Tenn. 1999)] test.

*Id.* at 721-22.

Here, Defendant was charged with first degree felony murder in Count 1 and attempted first degree murder in Count 2. Following the close of the State's proof, the trial court dismissed the attempted first degree murder charge in Count 2. The trial court partially dismissed the first degree felony murder charge in Count 1, stating that the State's inability to prove Defendant had a specific intent to kill Jonathan Amerson "[did] not affect the possibility of second[]degree [murder] on down." Because second degree murder is a lesser-included offense of first degree felony murder, Defendant had notice of the charges and there was no amendment to the indictment. *Id.* Defendant is not entitled to relief on this issue.

### III. Motion for Mistrial

Defendant argues that the trial court abused its discretion when it denied Defendant's motion for mistrial in response to Jonathan Amerson's testimony that someone told him Defendant had previously shot at him. The State points out the trial court properly gave limiting instructions to the jury.

Our supreme court summarized the law regarding appellate review of a trial court's denial of a motion for mistrial by stating the following:

"The law is well-settled that the decision of whether or not to enter a mistrial rests within the sound discretion of the trial court. This Court will not interfere with the trial court's decision absent a clear abuse of discretion on the record." *Reid*, 91 S.W.3d at 279. "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The party seeking a mistrial has the burden of establishing its necessity. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008).

*State v. Bell*, 512 S.W.3d 167, 187 (Tenn. 2015). When determining whether the trial court should have granted a mistrial based upon testimony that was presented to the jury, we consider three nonexclusive factors: "(1) whether the State elicited the testimony, or whether it was unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." *Id.* at 188 (quoting *State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009)).

During the State's direct examination of Jonathan Amerson, the following exchange occurred regarding a shooting in October of 2016:

Q.      [ ][Jonathan] Amerson, I'm actually going to start a little early [sic] with you. Do you remember an incident that took place in Dyersburg, near Connell Street, on October 12th, 2016?

A.      Yes, sir.

Q.      What happened that day?

A.      Me and a group of guys was walking and somebody pulled out a gun and then started shooting.

. . .

Q.      When the person started shooting at you, do you know who it was?

- 10 -

A.               I didn't at the moment. But later on, they told me it was [Defendant].

Defense counsel objected. The trial court sustained the objection and instructed the jury to disregard the statement. The State then questioned Jonathan Amerson about why he went into the house on November 17, 2016, around 3:00 p.m. when he was told that Defendant and Mr. Kincaid had arrived:

Q.               Why did you go in the house?

A.               Because [Defendant] had - - he was the one that shot at me on west side, so I don't know what he was on.

Defense counsel again objected. During a bench conference, defense counsel moved for a mistrial on the grounds that Jonathan Amerson's testimony was hearsay. Defense counsel argued the State used this testimony to prove Defendant previously shot at Jonathan Amerson. Defense counsel further argued that Jonathan Amerson went inside because he was scared of Defendant. Defense counsel stated, "It's an element of their crime. They have no way to prove it except through this hearsay testimony. And they've just gotten in it [sic], Your Honor. And there's no way to fix it." The trial court responded, "Well, I am fixing it." The trial court denied the motion for mistrial and stated to the jury, "You will disregard the statement about what someone else told [Jonathan Amerson.]"

Applying the factors listed in *Bell*, we note that the State attempted to elicit improper hearsay testimony from Jonathan Amerson when the State asked, "When the person started shooting at you, d[id] you know who it was?" Despite the State's assertion on appeal that "the first mention of it was via a non-responsive answer," the only logical response to the State's question was the improper testimony. The trial court sustained defense counsel's objection and instructed the jury to disregard the testimony. We do not believe that the State's subsequent question about why Mr. Amerson went inside the house was a direct attempt to elicit testimony about the prior shooting. Mr. Amerson's response to the question, which was the basis for defense counsel's motion for mistrial, was unresponsive. Furthermore, the trial court immediately issued a curative jury instruction. In a case with five eyewitnesses and Defendant's admission of the crime to Mr. Clark while in prison, Jonathan Amerson's testimony did not result in a manifest necessity for a mistrial. Further, the trial court dismissed the first degree felony murder and attempted first degree murder charges against Defendant, which were predicated on Defendant specifically intending to kill Jonathan Amerson.

For the forgoing reasons, we conclude that even though the State improperly sought to elicit hearsay testimony from Jonathan Amerson, the trial court issued proper curative instructions and did not abuse its discretion in denying the motion for mistrial.

## IV.    *Sentencing*

As a preliminary matter, Defendant lists two sentencing issues in separate headings in his brief outline, but consolidates them into one issue section in his analysis. For consistency, we choose to do the same. Defendant argues that the trial court abused its discretion when it ordered consecutive sentencing and that insufficient evidence existed to justify the imposition of the 40-year sentence for the second degree murder conviction. The State argues that the trial court properly exercised its discretion in imposing consecutive sentencing and a within-range sentence for the second degree murder conviction after "making the appropriate consideration and finding a multitude of enhancement factors." We agree with the State.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A §§ 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4). The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709.

The trial court properly considered all of the factors set out in Tennessee Code Annotated section 40-35-210 prior to ordering Defendant's sentences. The trial court relied on enhancement factors (1), (3), (4), (9), (10), and (12) in fashioning Defendant's sentence. *See* T.C.A. §§ 40-35-114(1), (3), (4), (9), (10), and (12). The trial court found that Defendant's combined prior nine misdemeanors and seven felonies convictions, justified application of enhancement factor (1), that Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. *See* T.C.A. § 40-35-114(1). The trial court applied enhancement factors (3) and (4), that the offense involved more than one victim and that the victims were particularly vulnerable, based on the evidence that Defendant shot nine individuals, including young children. *See* T.C.A. §§ 40-35-114(3) and (4). The trial court found enhancement factor (10), that Defendant had no hesitation about committing a crime when the risk to human life was high, applicable on all counts because of Defendant's lack of hesitation in walking up, unprovoked, to a child's birthday party and shooting into the crowd. *See* T.C.A. § 40-35-114(10). The court found enhancement factor (9) applicable to the second degree murder count because of Defendant's use of a weapon. *See* T.C.A. § 40-35-114(9). The court applied enhancement factor (12), that Defendant's actions resulted in the death of, or serious bodily injury to, another person, because Defendant's intended victim was unclear, and he was "indiscriminately shooting" into the crowd of children and adults. *See* T.C.A. § 40-35-114(12). The trial court declined to apply any mitigating factors. The trial court sentenced Defendant to the maximum within-range sentence of 40 years for the second degree murder conviction as a Range II Offender for a Class A felony, and a within-range sentence of 10 years as a Range III Offender for Class C felonies, for each of the eight aggravated assault convictions and the reckless endangerment conviction, to run concurrently with each other but consecutive to the 40-year sentence for second degree murder. *See* T.C.A. §§ 39-13-102, -103, -210; 40-35-112(b)(1), (c)(3). Because the trial court considered the relevant sentencing principles and imposed within-range sentences, the trial court's decision is entitled to a presumption of correctness. *Bise*, 380 S.W.3d at 709-10.

We conclude that the trial court's application of enhancement factor (3) was improper. *See* T.C.A. § 40-35-114(3); *State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002) ("[T]here cannot be multiple victims for any one offense of aggravated assault committed against a specific, named victim."). Despite the trial court's misapplication of enhancement factor (3), however, the sentences imposed were within the statutory range and consistent with the purposes and principles of sentencing, and we accordingly conclude there was no abuse of discretion.

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding

consecutive sentencing. *Id.* at 859. This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1); *see State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2); *see Imfeld*, 70 S.W.3d at 708.

The trial court ordered the 40-year second degree murder sentence to be served consecutively to the effective 10-year sentence for the eight aggravated assault convictions and the reckless endangerment conviction. The trial court applied Tennessee Code Annotated section 40-35-115(b)(2), that "defendant is an offender whose record of criminal activity is extensive," and Tennessee Code Annotated section 40-35-115(b)(4), that "defendant is a dangerous offender," in making its determination. A trial court need only find, by a preponderance of the evidence, that a defendant fits into at least one of the seven categories in Tennessee Code Annotated section 40-35-115(b), to order multiple offenses be served consecutively. T.C.A. § 40-35-115(b). Here, the trial court examined Defendant's record of criminal history, detailing each of Defendant's prior sixteen convictions. The presentence report filed as a supplemental exhibit further supports the trial court's finding that Tennessee Code Annotated section 40-35-115(b)(2) applied. Because the trial court properly ordered consecutive sentencing based on Tennessee Code Annotated section 40-35-115(b)(2), we find it unnecessary to examine the propriety of ordering consecutive sentencing based on the dangerous offender factor. Consequently, we find that the trial court was well within its discretion in applying the above-mentioned enhancement factors and consecutive sentencing factor and, therefore, we affirm its judgments.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE